JAMES EDWARD COLEN,

               Plaintiff,                   Case No. 14-cv-12948

v.                                 Paul D. Borman
                                 United States District Judge

CORIZON MEDICAL SERVICES,
*et al.,*                            Elizabeth A. Stafford
                                 United States Magistrate Judge

               Defendants.
_____/

**OPINION AND ORDER
(1) ADOPTING IN PART REPORT AND RECOMMENDATION (ECF NO. 94)
AND AMENDED REPORT AND RECOMMENDATION (ECF NO. 106);
(2) OVERRULING AND SUSTAINING IN PART
PLAINTIFF'S OBJECTIONS (ECF NOS. 92, 99);
(3) OVERRULING CORIZON DEFENDANTS'
OBJECTIONS AS MOOT (ECF NO. 95)
(4) GRANTING CERTAIN OF DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT (ECF NOS. 71, 79); and
(5) DENYING PLAINTIFF'S MOTIONS FOR EXTENSIONS
OF TIME TO RESPOND (ECF NOS. 107, 109)**

Plaintiff James Edward Colen, a prisoner proceeding *pro se*, brings this 42

U.S.C. § 1983 action alleging violations of his Eighth and Fourteenth Amendment

rights, as well as related state law claims, based upon alleged mistreatment by

healthcare providers and staff at the Gus Harrison Correctional Facility (ARF) in

Adrian, Michigan, where Plaintiff was incarcerated during the events described in his

Complaint. Plaintiff sues the Michigan Department of Corrections ("MDOC") and several MDOC employees and also sues Corizon Medical Services ("Corizon") and several Corizon healthcare providers who are alleged to have provided treatment to Plaintiff over a number of years. Plaintiff's claims begin with the alleged misdiagnosis and mistreatment of an ankle injury that he suffered during a basketball game at ARF in November, 2010, and include the alleged deliberate indifference of the Defendants to his evolving medical needs, allegedly related to this misdiagnosis and mistreatment, over a period of years.

Several Defendants have filed separate motions to dismiss and/or for summary judgment, some of which the Court has already ruled upon. Presently before the Court are Magistrate Judge Elizabeth A. Stafford's Report and Recommendations resolving the dispositive motions of two separate groups of Defendants: (1) Report and Recommendation (ECF No. 94) to GRANT Defendants Corizon Health, Inc., Alford, Brady, Jindal, Martin, Prasad, and Sudhir's Motion for Summary Judgment (ECF No. 79), to which both Defendants (ECF No. 95) and Plaintiff (ECF No. 99) have filed Objections. Both Defendants (ECF No. 100) and Plaintiff (ECF No. 98), have responded to the other parties' Objections. Plaintiff filed a Reply in support of his Objections. (ECF No. 101); and (2) Amended Report and Recommendation (ECF No. 106) to Grant MDOC Defendants VanAusdale, Kopka, Rothhaar and Klee's Motion

to Dismiss and/or For Summary Judgment (ECF No. 71), to which Plaintiff has filed Objections (ECF No. 92.); Having conducted a *de novo* review, pursuant to 28 U.S.C. § 636(b)(1), of those parts of the Magistrate Judge's Report and Recommendations to which specific objections have been filed, the Court OVERRULES the Objections, ADOPTS IN PART the Magistrate Judge's Report and Recommendations, and GRANTS Defendants' Motions for Summary Judgment on Plaintiff's federal 42 U.S.C. § 1983 claims.

## I.    BACKGROUND

On or around November 10, 2010, Plaintiff suffered an injury to his right foot/ankle while playing a game of basketball at the ARF in Adrian, Michigan. (ECF No. 13, Pl.'s Amended Complaint ("Compl.") ¶ 21, PgID 82.) On November 17, 2010, Plaintiff kited healthcare, stating that he had injured his ankle in a basketball game some days ago but it "didn't feel that bad" and he kept playing on it for about a week. (Compl. Ex. B, Healthcare Kites PgID 147.) Plaintiff stated that "then one day" he woke up and "couldn't hardly walk on it." (*Id.*) Plaintiff was seen by ARF Nurse Arlene Rogers, "and another nurse," who diagnosed a sprain and gave Plaintiff an ace bandage to wear. (Compl. ¶ 22; Ex. B, 11/17/10 Kite PgID 147.) Plaintiff was also issued crutches, a "lay in with meals and meds OUT," and a temporary restriction of "no work assignment." (ECF No. 81, Ex. 1, MDOC Certified Medical Records

("Med. R.") PgID 813.)

On or about December 9, 2010, Plaintiff kited healthcare again seeking to have his foot rechecked. Lynn Van Ausdale, RN, scheduled an appointment with the nurse to recheck Plaintiff's foot. (Med. R. PgID 814.) Plaintiff was seen on December 13, 2010, by nurse Deborah Ellenwood complaining of continued pain in his right ankle and also complaining of edema in his left toes and left hand. (Med. R. PgID 815.) The examination on December 13, 2010 noted no redness, bruising, or edema of the right ankle or the left foot, and found edema in hand to have resolved. Plaintiff was advised to purchase ibuprofen and to keep wearing the ace wrap on his right ankle and apply warm compresses to swollen hands in the mornings as needed for discomfort. Plaintiff was advised to kite again if symptoms did not improve. (Med. R. PgID 815.)

On or about January 6, 2011, Plaintiff did kite again, complaining of continued pain in his ankle causing him to limp while walking, and requesting to be seen by a doctor and to have x-rays taken. (Med. R. PgID 818.) Nurse VanAusdale responded and an appointment was scheduled with a medical provider. (Med. R. PgID 819.) Plaintiff was seen again on January 10, 2011, by health services, and told to continue taking his ibuprofen and was informed that he had an appointment with the medical provider scheduled on January 12, 2011. Plaintiff was seen by Physician's Assistant Rosilyn Jindal for the first time on January 12, 2011. (Med. R. 820-21.) PA Jindal

found minor swelling of the right ankle, no bruising or redness of the skin. (Med. R. 821.) Given Plaintiff's report of a sports injury, Jindal confirmed the diagnosis of an ankle sprain and saw no diagnostic indication of a fracture, i.e. no bruising, redness, or deformity, and no indication for an x-ray. She prescribed continued use of the ace wrap, elevation of the foot at night, continued use of non-steroidal anti-inflammatories ("NSAIDs") along with Tylenol and a program of rehabilitation exercises. (Med. R. 821; ECF No. 79-2, March 15, 2016 Declaration of Rosilyn Jindal ¶¶ 1-8, PgID 658-61.)

On January 30, 2011, Plaintiff kited again, this time complaining of swelling of both hands, sore wrists, swelling of his left knee and left foot. Plaintiff was seen by Victor J. Kaczmar, RN, ordered an ace wrap, and was scheduled to be seen on February 1, 2011. (Med. R. PgID 824-25.) On February 7, 2011, Plaintiff again presented to health care services complained of generalized musculoskeletal pain and was seen by PA Jindal. (Med. R. PgID 828; Jindal Decl. ¶ 9.) Plaintiff described an onset of symptoms 4 weeks prior, and did not identify any mechanism of injury. Both hands and his left leg were symptomatic with swelling and pain, and pitting edema was noted on Plaintiff's left lower leg. (Med. R. PgID 828.) Jindal examined Plaintiff's foot and ankle again and found no indication of a foot or ankle fracture. (Jindal Decl. ¶ 9.) Plaintiff was prescribed knee length support stockings and ordered

to report for regular blood pressure monitoring due to a finding of an elevated blood pressure. PA Jindal suspected that Plaintiff's increased blood pressure may have possibly been causing the swelling. (Med. R. PgID 829; Jindal Decl. ¶ 9.) He was instructed to "ambulate daily and regularly," to avoid excessive salt and caffeine intake, to elevate his legs as much as possible and to continue taking ibuprofen twice daily. (Med. R. PgID 829; Jindal Decl. ¶ 9.) Jindal signed the medical detail order for Plaintiff's support stockings and ordered regular blood pressure checks. (Med. R. PgID 831; Jindal Decl. ¶ 9.) On February 9, 14, 21, 28, and March 7, 2011, Plaintiff's vital signs and blood pressure were monitored. (Med. R. PgID 831-36.) Jindal determined Plaintiff to be pre-hypertension based on these readings, which did not indicate treatment with medication at that time. (Med. R. PgID 837.) Plaintiff was advised on dietary and lifestyle modifications to address his pre-hypertension. (Med. R. PgID 837.)

On April 11, 2011, Plaintiff kited healthcare again, asking to be seen for follow up care for the swelling in his left knee and lower leg and right wrist. (Med. R. PGID 839.) Plaintiff was scheduled by Nurse VanAusdale to be seen on April 14, 2011 by PA Jindal and x-rays of his left knee and wrists were ordered to rule out arthritis. (Med. R. 840.) Plaintiff was seen by PA Jindal on April 14, 2011, and complained of swelling in his left knee, popping, and mild pain with motion. PA Jindal suspected

prepatellar bursitis, and Plaintiff was given an ace bandage for his left knee and Naprosyn for the inflammation and Tylenol for the pain and ordered to rest and ice the knee as much as possible. (Med. R. PgID 839-42; Jindal Decl. ¶ 10.) Jindal suspected arthritis and ordered x-rays of Plaintiff's right wrist and left knee. (Med. R. PgID 842; Jindal Decl. ¶ 10.) Plaintiff did have the x-rays on April 21, 2011, and both revealed normal soft tissue appearance and an overall "Normal" impression. (Med. R. PgID 844; Jindal Decl. ¶ 10-11.)

On May 11 and 19, 2011, Plaintiff again kited healthcare complaining of pain and swelling in his left knee and right hands and wrist and pain in his right foot and ankle. Nurse VanAusdale scheduled Plaintiff to be seen on or about May 16, 2011 and Nurse Kaczmar explained to Plaintiff that he was scheduled to be seen on May 20, 2011. (Compl. ¶¶ 23-24, Ex. B, PgID 149; Med. R. PgID 845-47.) On May 20, 2011, Plaintiff was seen by nurse Christine Clark regarding complaints of chronic pain and swelling in his joints. Plaintiff was given a bottom bunk bed detail, elevator use authorization, and ordered a wood cane. (Med. R. PgID 847-50; Jindal Decl. ¶ 12.) Plaintiff subsequently declined the elevator pass, stating that "he does not need an elevator use pass." (Med. R. PgID 851.)

On May 26, 2011, Plaintiff was again seen by PA Jindal who noted Plaintiff's continued complaints of joint pain and swelling in hands, wrists, and right foot,

symptoms which had been occurring for the past five months and were relieved by anti-inflammatories ("NSAIDs") and pain medications. Jindal noted that Plaintiff did not meet the criteria for bottom bunk detail and cane based on his x-ray results but he would continue to be monitored for arthritis and was encouraged to follow up if the condition worsened or Plaintiff saw no improvement. (Compl. ¶ 25; Med. R. PgID 854-857; Jindal Decl. ¶ 13.) Jindal did not observe any sign of joint damage, a foot fracture, or ankle sprain in her notes. (Med. R. PgID 854-57; Jindal Decl. ¶ 13.)

Plaintiff continued to refill his prescriptions for Naprosyn and, on July 14, 2011, Plaintiff was seen by Nurse Deborah Marine, complaining of pain in his left knee and right ankle, especially when he first gets up in the morning and puts weight on the ankle and leg, but stating that the ace wrap helped to relieve the pain. Plaintiff was given an order for crutches and two ace wraps with four clips. Nurse Marine referred Plaintiff to a provider and he was seen by PA Jindal on July 18, 2011. (Med. R. PgID 858-65; Jindal Decl. ¶ 14.) PA Jindal noted swelling over the lateral mallelous of Plaintiff's right foot and diagnosed a peroneal ankle sprain. Plaintiff was given materials on rehabilitation exercises, told to continue with ace wrap, and elevate and ice often. PA Jindal concluded that an x-ray of Plaintiff's ankle was not medically indicated, noting that an "x-ray of the ankle is not going to change the course of treatment for ankle sprain." (Med. R. PgID 863-64; Jindal Decl. ¶ 14.)

Plaintiff's Naprosyn and Tylenol continued to be ordered into October, 2011, when Plaintiff kited healthcare again on October 13, 2011, requested to see a doctor regarding swelling in his left knee, right foot, hands and wrists. Plaintiff stated that he did not want to see an assistant but needed to see a doctor. Nurse Ellenwood told Plaintiff that his prescriptions for Tylenol and Naprosyn had been renewed and that he would be examined by a nurse to determine whether he needed to see a doctor. (Compl. ¶ 26, Ex. B PgID 153-54; Med. R. PgID 865-70.) Plaintiff states that he was not scheduled to see a doctor and continued in pain "for the rest of the year." (Compl. ¶ 26.) The medical records indicate that in fact Plaintiff was seen by Matthew Brown on October 18, 2011, and reported pain in his right ankle and left knee that was unchanged since July 2011, "some days worse than others," worse in the morning but improving throughout the day. (Med. R. PgID 871; Jindal Decl. ¶ 15.) The measurements of Plaintiff's left knee and right ankle were unchanged since May, 2011. (Med. R. PgID 871; Jindal Decl. ¶ 15.) Plaintiff stated that he was taking his Tylenol and Naproxen as prescribed and reported "relief after medicating." Mr. Brown noted that Plaintiff walked out of health services "without difficulty." (Med. R. PgID 871.) Plaintiff continued to refill his pain medications throughout October and November, 2011, and in December, 2011, Plaintiff indicated to healthcare that he wanted to discontinue the use of Tylenol and continue with the Naprosyn, which

Plaintiff continued to fill throughout December, January, and February. In February, Plaintiff requested renewal of his Tylenol, which he was able to purchase at the prisoner store. (Med. R. PgID 873-83.)

Plaintiff next kited healthcare in April, 2012, complaining of swelling in his left knee, right foot, hands and wrists and complaining of pain in his left knee, which was described as "sharp, throbbing, constant, 8-9 in scale." (Compl. ¶ 27; Med. R. PgID 884-85; Jindal Decl. ¶ 16.) Plaintiff's Amended Complaint confirms that he did not kite healthcare between November, 2011, and April, 2012. (Compl. Index of Medical Kites, PgID 121.) Nurse Ellenwood saw Plaintiff on April 23, 2012, and scheduled him to see another nurse the next day. (Med. R. PgID 884.) Nurse Marine saw Plaintiff on April 24, 2012, and scheduled him for an immediate visit with a medical provider, Dr. Anil Prasad, whom Plaintiff saw that day. Dr. Prasad noted Plaintiff was seen as "emergent for RN referral" for "left knee pain," which had worsened over the last week. (Med. R. PgID 885-86; Jindal Decl. ¶ 16.) Dr. Prasad examined Plaintiff's left knee which was tender and increased Plaintiff's Naprosyn dosage, prescribed Tylenol and ace wrap and ice and one week of rest. (Med. R. PgID 886; Jindal Decl. ¶ 16.) Dr. Prasad also ordered Plaintiff a left knee brace. (Med. R. PgID 888; Jindal Decl. ¶ 16.) Dr. Prasad's examination notes expressly state that Plaintiff presented with "no other complaints." (Med. R. PgID 886; Jindal Decl. ¶ 16.)

On May 22, 2012, Plaintiff was seen by PA Jindal regarding complaints of left knee pain and right hand pain. (Med. R. PgID 892-93; Jindal Decl. ¶ 17.) Jindal prescribed prednisone and instructed Plaintiff to continue with Naprosyn for pain and swelling. Jindal denied bottom bunk detail because Plaintiff had no indication of a fracture, joint injury, severe sprain or other conditions beyond soft tissue injury, and did not therefore meet "criteria per MSAC guidelines." (Med. R. PgID 893; Jindal Decl. ¶ 17.)

In September, 2012, Plaintiff again kited healthcare, complaining that he had been receiving only conservative management of his pain by PA Jindal and was being denied his constitutional rights under the Eighth Amendment. (Compl. ¶ 28, Ex. B, PgID 156.) On October 13, 2012, Plaintiff kited again and was scheduled to see a nurse on October 16, 2012. Plaintiff asked to see a doctor but was scheduled by the nurse to see PA Jindal. (Compl. ¶ 29, Ex. B, PgID 157; Med. R. PgID 897; Jindal Decl. ¶ 18.) Plaintiff saw PA Jindal on October 18, 2012, stating that the pain in his left knee was severe, that the pain is radiating to the left ankle, and aggravated by walking. (Med. R. PgID 901; Jindal Decl. ¶ 18.) Jindal diagnosed prepatellar bursitis, prescribed Naprosyn, ace wrap, warm compresses, elevation and exercise and also ordered repeat x-rays of the left knee to compare to the April, 2011 x-rays and x-rays of Plaintiff's right foot because Plaintiff noted pain in his right foot as well as his left

knee.  (Med. R. PgID 901-903; Jindal Decl. ¶ 18.)

On October 23, 2012, Plaintiff had the additional x-rays of his left knee and his right foot.  (Med. R. PgID 904; Jindal Decl. ¶ 19.)  The views of the left knee were compared to the x-rays taken on April 21, 2011, and arthritic changes were "markedly advanced," at the knee joint articulating surface and the patellofemoral joint area. There was no evidence of displaced fracture or any other acute osseous abnormalities. (*Id*.)  The view of the right foot demonstrated a moderate sized plantar calcaneal spur, mild arthritic changes in the midfoot and toes, mild soft tissue swelling and a mild valgus deformity of the big toe.  (*Id*.)  The x-rays indicated chronic degenerative changes of arthritis and gave no indication that Plaintiff suffered a fracture of his right foot.  (Jindal Decl. ¶ 19.)

Plaintiff kited healthcare again on November 4, 2012, complaining of pain in knee and foot and demanding to know the results of his x-ray.  (Compl. ¶ 30, Ex. B PgID 158-60.)  On November 13, 2012, Nurse Kaczmar responded that Plaintiff would be scheduled to see a medical provider to review his x-ray results.  (Compl. ¶ 31, Ex. B PgID 161; Med. R. PgID 906.)  Plaintiff did see PA Jindal on November 13, 2012, and discussed x-ray results and was provided materials regarding osteoarthritis, range of motion exercises, and was ordered a bottom bunk detail.  (Med. R. PgID 907-09; Jindal Decl. ¶ 20.)  Also on November 4, 2014, Plaintiff kited the Health Unit

Manager Kopka, stating that he was suffering from a systemic injury that started with his ankle injury and now spread to his "grossly swollen" knee and alleging that PA Jindal was "disinterested" and was not performing any tests other than her visual observation. Plaintiff asserted that he was being denied urgent medical care and was demanding to see the "staff physician" in order to make a proper diagnosis." (Compl. ¶ 32, Ex. B PgID 159-160.) HUM Kopka responded on November 15, 2012, stating that there have been several visits with the medical provider, the most recent being on November 13, 2012, at which the medical provider discussed the results of Plaintiff's x-rays. HUM Kopka instructed Plaintiff to continue to kite if symptoms did not improve. (Compl. ¶ 33, Ex. B PgID 162; Jindal Decl. ¶ 22.)

Plaintiff did not kite again until April 5, 2013, when he "asked to see a board certified medical doctor," and "NOT" PA Jindal, because his legs were swollen and he could barely walk and his pain medications were no longer working. Plaintiff's Amended Complaint confirms that he did not kite healthcare between November, 2012 and April, 2013. (Compl. Index of Medical Kites PgID 121.) On April 7, 2013, and April 22, 2013, Nurse Velarde responded that he would be scheduled to be evaluated by a nurse for referral to a medical provider, PA Jindal, who would be the one to make a referral beyond that. (Compl. ¶ 34, Ex. B PgID 163; Med. R. PgID 912, 917.) On April 24, 2013, Plaintiff saw Nurse Ellenwood who encouraged Plaintiff to

use warm compresses and scheduled an appointment for Plaintiff to see PA Jindal on April 26, 2013. (Med. R. PgID 918.) Plaintiff did see PA Jindal on April 26, 2013, who diagnosed the same condition of osteoarthritis and prescribed a knee brace to help with instability and swelling. PA Jindal explained to Plaintiff that he could not demand to see a particular doctor or specialist and that she, as a midlevel provider, is trained to refer patients as necessary. (Med. R. PgID 920-22; Jindal Decl. ¶ 23.) PA Jindal prescribed the brace, noting that the arthritic changes were markedly advanced, that there was a loss of joint space, that patient was in severe pain that was not improved with anti-inflammatories and that patient wanted surgery. (Med. R. PgID 922.) But Dr. Haresh Pandya, MD denied the request for a knee brace on April 29, 2013, noting that braces do not help Plaintiff's condition and that knee range of motion and rehabilitation exercises, along with self massage, offered the best treatment. (Med. R. PgID 923.)

On June 6, 2013, Plaintiff kited healthcare again requesting to see a doctor and stating that he was in "GREAT PAIN," and that his left knee was swollen and his right ankle was "turning over." (Compl. ¶ 37, Ex. B PgID 167.) On June 7, 2013, Nurse Velarde responded that Plaintiff was scheduled to have his symptoms assessed by the nurse and on June 7, 2013, Plaintiff was "called out without an appointment" to see Dr. Anil Prasad. (Compl. ¶ 38; Med. R. PgID 933-34.) Dr. Prasad advised to take

14

Naprosyn and added Tylenol and gave an ace wrap to use as directed and to kite if symptoms got worse and provided a detail for a cane. (*Id*.; Jindal Decl. ¶ 24; Med. R. PgID 935.)

On July 11, 2013, Plaintiff was seen again by PA Jindal complaining of worsening knee pain. PA Jindal discontinued Naprosyn, started ibuprofen and ordered intra-articular Kenalog injections for Plaintiff's knee to begin in two weeks and ordered a bottom bunk detail, a cane, and support hose. (Med. R. PgID 946-49; Jindal Decl. ¶ 27.) On July 28, 2013, Plaintiff kited again asking to see a "board certified medical doctor and a knee specialist," requesting an MRI of his foot, claiming negative effects from a medication change and complaining that he had waited two weeks for medical treatment ordered for his knee (the Kenalog injections) that was canceled. (Compl. Ex. B PgID 170; Med. R. PgID 950.) Plaintiff kited again on August 9, 2013, complaining that he had been waiting over four weeks for his knee injections which had been repeatedly canceled. (Med. R. PgID 951; Compl. ¶ 42, Ex. C PgID 323.) The kite response to Plaintiff's August 9, 2013 kite explained that there was only one provider available and appointments had to be canceled and rescheduled to take care of "emergent issues." (Med. R. PgID 951; Compl. Ex. B PgID 172; Jindal Decl. ¶ 28.) Plaintiff kited again on August 23, 2013, complaining that his kites were being ignored, that he has never been scheduled for the knee injections that Jindal

ordered on July 11, 2013, and again asking to see a board certified doctor. (Compl. Ex. B PgID 174.) Nurse Velarde responded that a request to see a board certified doctor cannot be answered by sending a kite and explaining that a medical provider (PA Jindal) will refer to another provider if she deems it medically necessary. (Compl. Ex. B PgID 175.)

On September 30, 2013, Plaintiff saw Dr. Darrell Brady, who ordered repeat x-rays of Plaintiff's left knee and right foot. Plaintiff explained to Dr. Brady that he had injured his foot in a basketball game two years ago and believes that by shifting his weight onto his left leg to avoid the pain in his right foot, he developed left knee pain that has progressed to the point where he has begun to walk on the toes of his left foot. Dr. Brady noted that prior x-rays of Plaintiff's right foot and left knee reported only arthritic changes. Dr. Brady performed several clinical diagnostic tests on Plaintiff and found the left knee warm with some swelling and limited range of motion and found the right foot without any deformity or obvious soft tissue swelling and no specific point of tenderness. Dr. Brady suspected Plaintiff may have a loose body in his knee and ordered updated foot and knee x-rays in view of the progression of symptoms and held off on the steroid injections pending the results of the x-rays. (Med. R. PgID 957- 60; ECF No. 79-3, March 15, 2016 Declaration of Darrell Brady ¶ 23.) Dr. Brady's examination of Plaintiff's right foot ruled out a fracture and found Plaintiff's

complaints about his foot consistent with the diagnosis of arthritis. (Brady Decl. ¶ 23.) Plaintiff thought that the purpose of the appointment with Dr. Brady was to receive the steroid injections he had missed (Compl. ¶ 43) but Dr. Brady determined to wait on any aspiration of Plaintiff's knee or steroid injections for the results of the x-rays. (Brady Decl. ¶ 23.)

Plaintiff did have x-rays on October 8, 2013, which showed "moderate and advanced arthritic changes" in Plaintiff's knee and arthritic changes in Plaintiff's mid-foot joint, the suggestion of old healed trauma of the first metatarsal bone (forefoot), and a plantar calcaneal spur. (Med. R. PgID 963; Brady Decl. ¶ 24.) Plaintiff states that Dr. Brady told him that his foot had been broken in the past, but Dr. Brady explained that he did not reach or express that conclusion and that the word "trauma" as used in the x-ray report includes any injury to the bone and, in any event, there was no indication of a fracture that healed incorrectly. (Brady Decl. ¶ 25.) Dr. Brady opined that even if Plaintiff had suffered a foot fracture, there was no indication that Plaintiff's foot required any additional treatment beyond what had been pursued prior to Dr. Brady's examination in September/October, 2013. (Brady Decl. ¶ 26.)

Dr. Brady saw Plaintiff again for follow up on October 14, 2013, diagnosed Plaintiff with chronic, progressive arthralgia of the left knee and explained that the steroid injections had been deferred due to suspicion of a loose body, which was not

present on x-ray. (Med. R. PgID 965-66; Brady Decl. ¶ 27.) Dr. Brady noted that he would still consider a steroid injection but thought they would be of questionable benefit. (Brady Decl. ¶ 28.) Dr. Brady changed Plaintiff's NSAID to Mobic, a different anti-inflammatory effective for arthritis. Dr. Brady also noted he would consider referral to an orthopedic surgeon before proceeding with steroid injections and also opined that had Plaintiff received the steroid injections when they were ordered by PA Jindal, it would not have halted the deterioration in his left knee or improved his condition. (Med. R. Pg ID 966; Brady Decl. ¶¶ 27, 28.)

On October 24, 2013, Plaintiff saw Dr. Bahmini Sudhir, MD. (Med. R. PgID 972-975; Brady Decl. ¶ 29.) Dr. Sudhir noted that Plaintiff walked into the exam in apparent pain, had to walk on the toes of his left foot because of the inability to straighten his left leg, and that removing clothing seemed a chore. Dr. Sudhir noted that Plaintiff had a bony enlargement on his right foot due to Osteoarthritis with restricted range of motion in all directions. Dr. Sudhir noted severe Osteoarthritic changes in Plaintiff's left knee, with deformity and limited range of motion. Dr. Sudhir ordered a wheelchair for Plaintiff for long distances, a geriatric pusher and an elevator pass. Dr. Sudhir ordered Plaintiff to continue with the Mobic and planned to send in an orthopedic consult. (*Id*.) Dr. Sudhir did not note the presence of an unhealed fracture in Plaintiff's foot and did not order steroid injections.

On November 6, 2013, Plaintiff kited healthcare complaining that he was seen on October 14, 2013, and steroid injections were ordered. (Med. R. PgID 980.) Nurse Paratchek checked the records and appropriately responded that steroid injections were being considered but had not been ordered. (*Id.*) On November 12, 2013, Plaintiff was instructed to kite for his medications about one week before they run out so that he is not without his meds while waiting for them to be delivered. (Med. R. PgID 981.) On November 13, 2013, Plaintiff saw the orthopedic surgeon, Dr. Ikram, who ordered repeat x-rays of his left knee which demonstrated advanced arthritic changes and mild soft tissue swelling in the prepatellar and suprapatellar region medially of the knee. Dr. Ikram diagnosed Plaintiff with severe Degenerative Joint Disease of left knee and recommended that he be started on Indocin. Dr. Ikram states that Plaintiff is a candidate for a total knee replacement. Dr. Ikram questioned whether the advanced degenerative changes were due to just wear and tear or whether Plaintiff's prior drug use may have contributed to the advanced arthritic conditions. (Med. R. PgID 982-984; Brady Decl. ¶ 30.) Plaintiff continued to kite through November asking when his surgery would be happening. He was told that his new medications had been ordered and that the medical provider had submitted the request for approval for knee replacement and was awaiting a response. (Med. R. PgID 989-1002; Brady Decl. ¶ 31.) Plaintiff received his Indocin sometime in mid-November

as he complains on December 3, 2013 that he has been taking it for two weeks and it makes him nauseous and Plaintiff self-discontinued the Indocin. (Med. R. PgID 1004-10.) The request for the surgery was approved on December 9, 2013. (Med. R. PgID 1008-09; Brady Decl. ¶ 31.) Plaintiff was seen by PA Jindal on December 20, 2013, and informed that both the surgery and pre-op consultation had been approved. (Med. R. PgID 1019-20; Jindal Decl. ¶¶ 32-34.) Plaintiff was using a wheelchair for long-distances only and still complained of foot and ankle pain. (*Id*.) Plaintiff continued to receive medications and attend appointments related to preparation for surgery in February and March. (Med. R. PgID 1010-1047.) On March 31, 2014, Plaintiff saw Dr. Brady for a history and physical examination in preparation for his upcoming knee replacement surgery. (Med. R. PgID 1048-50; Brady Decl. ¶ 32.) Dr. Brady discontinued the Indocin and resumed Mobic due to Plaintiff's complaints of side effects of the Indocin. Dr. Brady instructed Plaintiff to follow up in one month after his surgery and prescribed post-operative medications. (Med. R. PgID 1050-52; Brady Decl. ¶ 32.) On April 1, 2014, Plaintiff was ordered several pre-op medications (Med. R. PgID 1054-55.)

Plaintiff underwent total knee replacement with Dr. Cochran on April 17, 2015 and was admitted to the Duane L. Waters Health Center after surgery for inpatient care and physical therapy. (Med. R. PgID 1073-74; Brady Decl. ¶ 33.) Physician's

Assistant Danielle Alford performed Plaintiff's intake history and physical on his admission to Duane Waters for his post-operative care. PA Alford states that Plaintiff has a past medical history of degenerative joint disease that necessitated left total knee replacement on April 17, 2014. Plaintiff gives a history of having injured his right foot about three years ago and subsequently having his left knee become inflamed and painful. (Med. R. PgID 1075; Brady Decl. ¶ 33.) Plaintiff described pain to his left knee 8/10, and mild chronic paid to right foot and elbow. Plaintiff was ambulating within his room post-op to the toilet. (Med. R. PgID 1075; Brady Decl. ¶ 33.) Plaintiff's incision was checked and his right foot was tender to palpation of the dorsum but showed no edema and had normal range of motion. (Med. R. PgID 1076; Brady Decl. ¶ 34.) His strength was 5/5 in his upper extremities and his right lower extremity and 4/5 in his left lower extremity. (Med. R. PgID 1076.) Plaintiff was scheduled to begin physical therapy on April 20, 2014, and to use a walker for ambulation for two weeks. Plaintiff was scheduled for a follow up appointment with Dr. Cochran, his surgeon, in three weeks. (Med. R. PgID 1076.) With respect to Plaintiff's right foot and elbow arthritis, Plaintiff's past x-rays would be reviewed and he would be placed back on Mobic once off his post-off pain narcotics. (Med. R. PgID 1076.) Plaintiff's mobic was discontinued and he was started on a number of post-op pain medications, including Tramadol, Norco, and Aspirin, (Med. R. PgID

1079.)  Plaintiff continued to be seen daily at Duane Waters, continued to complain of pain in his left knee, was treated for hospital acquired pneumonia six days post-op, began physical therapy on April 25, 2014, often complained of pain in his right elbow and foot "just like arthritis in other joints," (Med. R. PgID 1165) and demanded to be seen by doctors and not Physician Assistants.  (Med. R. PgID 1080-1170.)  On April 26, 2014, Plaintiff was seen Dr. Lynn Larson who stated that Plaintiff's right foot pain was likely a flare up due to being off of Mobic and she prescribed moist heat to relieve the pain.  (Med. R. PgID 1166; Brady Decl. ¶ 36.)  Plaintiff required frequent breaks during physical therapy due to "pain and fatigue."  (Med. R. PgID 1169.)  On May 2, 2014, Plaintiff was ambulating with a single point cane and stated to his therapist that he did not need his walker anymore.  (Med. R. PgID 1188.)  Plaintiff reported that his right side was flaring up less after his surgery and, when instructed on proper use of his cane, reported that he "wasn't using the cane near anything like this before surgery."  (Med. R. PgID 1188.)  On May 6, 2014, Plaintiff was "complaining more of right foot pain than knee pain," and his progress in PT was limited by his complaints of flare ups in his right knee and foot.  (Med. R. PgID 1195-1202.)  During one therapy session Plaintiff refused to perform certain standing exercises, stating that "last time I did that, I sprained my ankle and went in the wheelchair for three years." (Med. R. PgID 1202.)  PT stated that it was unable to progress with Plaintiff due to

his declining to participate in the exercises. Plaintiff demanded to see the PA. (Med. R. PgID 1202; Brady Decl. ¶ 37.) At this same PT session, it was noted that Plaintiff had functionally met all set PT goals, was able to ambulate with a single point cane and was "safe for DC back to GP." (Med. R. PgID 1203.)

PA Alford ordered x-rays of Plaintiff right foot on May 20, 2014, and again the x-rays showed no evidence of a fracture or any acute osseous abnormality and showed mild chronic degenerative changes. (Compl. Ex. A, PgID 132; Med. R. PgID 1205; Brady Decl. ¶ 38.) Plaintiff was discharged from Duane Waters on May 20, 2014. (Med. R. PgID 1206.) In the discharge summary, PA Alford noted that "by the date of discharge, he no longer complained of pain to his left knee and was complaining exclusively about his right foot, requesting x-rays and increased pain medication." (Med. R. PgID 1206.) PA Alford noted that an x-ray was performed on the right foot and showed mild chronic changes, generalized osteopenia, and no acute abnormalities, which was "consistent with his previous x-rays in chronic nature," and also noted that physical therapy addressed his chronic foot pain and concluded "no increase in pain medications were warranted." (Med. R. PgID 1206; Brady Decl. ¶ 38.) PA Alford diagnosed Plaintiff's complaints of right foot pain as an "exacerbation of arthritis" similar to what Plaintiff suffered in October 2013, (Med. R. PgID 1212.) Plaintiff was to restart his mobic and to taper off of his narcotic pain medications. (Med. R. PgID

1208.)  PA Alford noted that Plaintiff had a follow up appointment with Dr. Cochran, his surgeon, on May 15, 2014, who stated that his knee was healing well and he should follow up in one year.  (Med. R. PgID 1206.)  Plaintiff was ambulating with a single point cane and a walker at the time of his May 21, 2014 discharge.  PA Alford noted that she had discussed Plaintiff's complaints of foot pain with him multiple times and that Plaintiff refused to wear shoes and insisted on wearing only shower shoes with socks, including at PT.  (Med. R. PgID 1211.)

On May 21, 2014, back at ARF, Plaintiff kited health care asking to see a doctor for his knee and foot pain and was seen by PA Jindal.  Although Plaintiff's therapist at Duane Waters noted that Plaintiff was ambulating with a single point cane on discharge, Plaintiff presented in a wheelchair when seen by PA Jindal the next day.  (Compl. ¶ 51; Med. R. PgID 1221-23; Jindal Decl. ¶ 39.)  PA Jindal warned Plaintiff of the risks of failure to ambulate after knee replacement surgery.  She agreed to review the x-rays of Plaintiff's right foot that were taken on May 20, 2014 and discontinued Plaintiff's wheelchair, encouraging him to ambulate with his cane.  Plaintiff was instructed to try ambulating with his self-purchased tennis shoes and was given a bottom bunk detail and a prescription for support hose. (Compl. ¶¶ 50-52; Med. R. PgID 1222, 1225.)

On May 28, 2014, Plaintiff was seen by Dr. Minnie Martin, MD, for an evaluation of his right foot pain. (Compl. ¶ 52; Med. R. PgID 1233-34; Brady Decl. ¶ 39.) Dr. Martin examined Plaintiff's right foot and noted that the pain extended from the right great toe laterally to the right posterior ankle. (Med. R. PgID 1233.) Dr. Martin noted the Mobic prescription and did not order further assessment or treatment of Plaintiff's right foot. (*Id.*) On May 28, 2014, Plaintiff kited health care complaining that he did not get a chance to ask Dr. Martin all of his questions. (Compl. Ex. B PgID 195; Med. R. PgID 1235.) Nurse Velarde responded to the kite, stating that Plaintiff should present his question in a kite and the nurse would answer the question or submit the question to the medical provider if unable to give a sufficient explanation. (Compl. Ex. B PgID 196; Med. R. PgID 1235.)

Plaintiff continued to kite health care, complaining of pain in his foot and asking why he was not given the "foot brace" that the physical therapist at Duane Waters had recommended for him and asking why his physical therapy had been discontinued after seven days. (Compl. Ex. B PgID 190-92.) The medical records from Duane Waters contain no recommendation for a "foot brace" and none appears in Plaintiff's medical order history. (Med. R. PgID 1215-1217.) The physical therapy medical records from Duane Waters do not mention a "foot brace," and indicate that physical therapy was stopped because no further progress could be made due to

Plaintiff's declining to participate in certain exercises. (Med. R. PgID 1202.) At his May 9, 2017 therapy session at Duane Waters, Plaintiff's therapist noted that Plaintiff had functionally met all goals and was safe to return to ARF. No mention is made of the need for a "foot brace." The goal stated for Plaintiff at his May 9, 2014 therapy session was to be "independent with progressive home exercise program within 1 week." (Med. R. PgID 1203.) There is no indication in the record that Plaintiff was prescribed a 4-6 weeks of scheduled physical therapy sessions or that he was ordered to have a "foot brace."

Mr. Colen's right knee, which had been asymptomatic, also developed arthritis and now may also require surgery. (Brady Decl. ¶ 8.) The presence of arthritis bilaterally, and a multiple joint presentation, suggested rheumatoid rather than osteoarthritis, which had been the diagnosis that informed Plaintiff's treatment over the previous three years. (Brady Decl. ¶ 8.) The diagnosis of rheumatoid arthritis has now been confirmed through lab work and Mr. Colen has been approved to see a rheumatologist for further evaluation. (Brady Decl. ¶ 9.) According to Dr. Brady, rheumatoid arthritis progresses at an unpredictable rate and the disease can be managed, but not cured. (Brady Decl. ¶ 9.) According to Dr. Brady, even if Mr. Colen had fractured his right foot in 2011, this would not be the cause of Plaintiff's rheumatoid arthritis, the chronic pain in his right foot and left knee, or the

deterioration of his left knee requiring joint replacement surgery. (Brady Decl. ¶¶ 10, 40.) Only after Plaintiff presented with extensive acute onset arthritis in his right knee did the medical providers suspect rheumatoid arthritis. (Brady Decl. ¶ 40.)

Dr. Brady states that the x-rays taken of Plaintiff's right foot rule out the claim that the medical providers misdiagnosed Plaintiff's November, 2010 injury as a sprain. (Brady Decl. ¶ 41.) Whatever "healed trauma" was noted in Plaintiff's 2013 x-ray healed correctly and the course of treatment provided by PA Jindal was appropriate even if Plaintiff had suffered a minor fracture. (Brady Decl. ¶ 41.) Dr. Brady opines that the medical providers' diagnosis of osteoarthritis and course of treatment were appropriate under the applicable standard of care. The medical providers placed Plaintiff on the appropriate course of treatment for arthritis, followed through on all necessary treatment and specialty consults, and obtained a total knee replacement, which met or exceeded the applicable standard of care. (Brady Decl. ¶¶ 41, 43.)

In sum, Plaintiff was seen, by Physicians Assistants and medical doctors, including specialists in orthopaedics, nearly 30 times over the course of three years for his complaints of persistent pain – principally in his right foot and left knee although other joints also were painful at times. Diagnostic tests were ordered, x-rays were taken which demonstrated arthritis but ruled out any fractures, x-rays were repeated demonstrating advancing arthritic changes and undifferentiated "trauma" that

had healed, different courses of treatment were attempted, different pain medications and anti-inflammatories were tried, and ultimately Plaintiff underwent a total knee replacement. Ultimately, Plaintiff was diagnosed with rheumatoid arthritis, and has been referred for treatment by a specialist in that discipline.

Plaintiff theorizes that his rheumatoid arthritis was caused by the original injury to his foot and by the Defendants failure to properly diagnose and treat his condition. But other than his lay opinion, Plaintiff offers no evidence to substantiate this claim, which is rejected by the only medical evidence in the record.

At its heart, Plaintiff's case, though we cannot doubt his claims of physical discomfort, is one questioning the correctness of the admittedly continuous clinical and diagnostic techniques and courses of treatment that he received for his complaints. In the end, he has not presented facts that state an actionable claim of deliberate indifference against any of these Defendants.

## II.    STANDARD OF REVIEW

A district court judge reviews *de novo* the portions of the report and recommendation to which objections have been filed. 28 U .S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). A district "court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Objections must be timely to be considered. A party who receives notice of the need to timely object yet

fails to do so is deemed to waive review of the district court's order adopting the magistrate judge's recommendations. *Mattox v. City of Forest Park,* 183 F.3d 515, 519-20 (6th Cir. 1999). "[A] party *must* file timely objections with the district court to avoid waiving appellate review." *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987) (emphasis in original).

Only those objections that are specific are entitled to a *de novo* review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id*. (internal quotation marks and citation omitted). A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. An "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Specific objections enable the Court to focus on the particular issues in contention. *Howard*, 932 F.2d at 509. Without specific objections, "[t]he functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrate's Act." *Id*.

"[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings [the objector] believed were in error" are too summary in nature. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (alterations added).

## III.    ANALYSIS

### A.    Plaintiff's Objections to the Magistrate Judge's January 18, 2017 Report and Recommendation to Grant Defendants Corizon Health, Inc., Alford, Brady Jindal, Martin, Prasad and Sudhir's Motion for Summary Judgment

In her January 18, 2017, Report and Recommendation to Grant Corizon Health, Inc., Alford, Brady, Jindal, Martin, Prasad, and Sudhir's (collectively "the Corizon Defendants") Summary Judgment, the Magistrate Judge found a genuine issue of fact as to one exhaustion issue but found that issue not material because, even assuming Plaintiff's claims were fully and properly exhausted, Plaintiff failed to create a triable issue of fact on his 42 U.S.C. § 1983 claim of deliberate indifference against any of the Corizon Defendants. The Magistrate Judge also concluded that certain of Plaintiff's deliberate indifference claims were barred by the applicable three-year statute of limitations. Having recommended dismissal of all of Plaintiff's federal law claims against the Corizon Defendants with prejudice, the Magistrate Judge recommended that this Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims of intentional infliction of emotional distress,

battery, and gross negligence, and dismiss those state law claims without prejudice. Plaintiff has filed a series of Objections to the Report and Recommendation.

1.  **"Objection No. 1: Plaintiff Objects to those parts of the Magistrate's Report and Recommendation granting Defendants' Summary Judgment Motion concluding that he failed to exhaust all of his administrative remedies."**

As Defendants correctly observe in their response to Plaintiff's Objections, Plaintiff appears to have misunderstood the Magistrate Judge's recommendation on the issue of exhaustion. As the Magistrate Judge found a question of fact on the issue of exhaustion, and recommended denying summary judgment on exhaustion grounds, she ruled in Plaintiff's favor on this issue and his Objection on this issue is OVERRULED.

2.  **"Objection 2: Plaintiff Objects to the part of the Magistrate's Report and Recommendation Granting Defendants' Summary Judgment Motion because allegations did not rise to the level of deliberate indifference to a serious medical need."[1]**

---

[1]  Within Plaintiff's "Objection No. 2" regarding deliberate indifference is a suggestion that the Magistrate Judge also erred in concluding that Plaintiff did not raise a Fourteenth Amendment Equal Protection Claim in his Amended Complaint. (Report at 15-16.) In support of this aspect of his second Objection, Plaintiff refers the Court to his Amended Complaint at PgIDs 96-98 and 100-117. A review of these pages reveals that PgIDs 96-98 contain allegations related solely to his deliberate indifference and PgID 100-111, Count II of his Amended Complaint labeled "Fourteenth Amendment Violation" contains nothing but the bare legal conclusion that Plaintiff's "right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the XIV." ("To state an equal protection claim in the prison context, a plaintiff must allege he was treated differently than other similarly situated

### a.    The deliberate indifference framework.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation

of a right secured by the Constitution and laws of the United States, and must show

that the alleged deprivation was committed by a person acting under color of state

law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Under the doctrine of qualified

immunity, "government officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Accordingly,

considering a claim of qualified immunity has two steps: "(1) whether, considering

the allegations in a light most favorable to the party injured, a constitutional right has

---

prisoners. . . . A conclusory allegation of discrimination without factual support is insufficient to state an equal protection claim."  *Wilson v. Michigan Dep't of Corrections*, No. 13-14404, 2015 WL 1004707, at *4 (E.D. Mich. March 6, 2015). The Magistrate Judge correctly concluded that the allegations of the Amended Complaint failed to put Defendants on notice of this claim.  "A plaintiff must at least give the defendant fair notice of what the claim is and the grounds upon which it rests, by providing either direct or inferential allegations respecting all the material elements to sustain a recover."  *In re Commonwealth Institutional Sec., Inc.*, 394 F.3d 401, 405 (6th Cir. 2005) (citations and internal quotation marks and bracket omitted).  Because the "well-pleaded facts of [Colen's] complaint do not permit an inference that [any Defendant] violated" the Equal Protection Clause of the Fourteenth Amendment, the Magistrate Judge correctly concluded that the Court need not consider this claim. *McColman v. St. Clair County*, 479 F. App'x 1, *4 (6th Cir. April 12, 2012).

been violated, and (2) whether that right was clearly established." *Richmond v. Huq*, __F.3d__, 2018 WL 1417546, at *11 (6th Cir. March 22, 2018) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) ).

The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The test for determining whether an officer was deliberately indifferent has both a subjective and an objective component. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The objective component is satisfied if the plaintiff alleges that the medical need at issue is "sufficiently serious." *Id.* at 703 (quoting *Farmer*, 511 U.S. at 834). "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (emphasis in original).

To satisfy the subjective criterion, the plaintiff must demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that

risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). "The requirement that the [doctor or] official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citing *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970). *See also Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 2005) ("a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment" so that "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.")

Deliberate indifference to medical needs may be established by showing an interruption of a prescribed plan of treatment, or a delay in medical treatment. *Estelle*, 429 U.S. at 104-05; *Darrah v. Krisher*, 865 F.3d 361, 368-69 (6th Cir. 2017). However, "[w]here a prisoner has received some medical attention and the dispute is

over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n. 5 (6th Cir. 1976). *See also Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1999) ("Deliberate indifference, however, does not include negligence in diagnosing a medical condition").  However, treatment decisions that are "so woefully inadequate as to amount to no treatment at all" can be actionable under the Eighth Amendment. *Westlake*, 537 F.2d at 860 n. 5.  *See also Miller v. Calhoun*, 408 F.3d 803, 820 (6th Cir. 2005) ("'When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'") (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

The touchstone of the second prong of the constitutional analysis is subjective awareness – that the medical provider actually perceived a risk of harm and consciously chose to ignore that risk:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106.  And, while this subjective component may be established "in the usual ways, including inference from circumstantial evidence," *Farmer*, 511 U.S. at 842,  the jury cannot be left to speculate regarding the possibility of such constitutionally offending knowledge of the prospect of harm merely based upon the passage of time. "[T]he mere existence of delay in receiving treatment is not enough for a jury to find deliberate indifference." *Santiago v. Ringle*, 734 F.3d 585, 593 (6th Cir. 2013) (discussing the subjective component of the deliberate indifference analysis and citing *Reilly v. Vadlamudi*, 680 F.3d 617, 625–27 (6th Cir. 2012)).  "On summary judgment, [Plaintiff] may not simply point to a delay and argue that a jury might not believe the doctor's explanation; he must put forth some additional evidence of deliberate indifference, since ultimately he has the burden of proof at trial."  *Id.* (citing *Celotex*, 477 U.S. at 322–24).

  **b.**  **Plaintiff's Objections to the Magistrate Judge's deliberate indifference ruling.**

  Plaintiff appears to claim both that the delay in timely diagnosing and properly treating his right foot/ankle and left knee injuries (themselves a serious medical condition) caused a serious medical condition (rheumatoid arthritis) and that the Defendants were subjectively aware that he suffered from a serious medical condition (right foot/ankle and left knee pain) and consciously chose not to offer him proper

treatment or refer him to the proper specialist. Although Plaintiff's Objections are not a model of clarity and not easy to parse, they appear to raise issues regarding both the objective and the subjective aspects of the deliberate indifference inquiry.

**The objective component**. Plaintiff appears to claim that the delay in diagnosing his rheumatoid arthritis caused his present serious medical condition. In his Objections, when discussing the "objective" component of the deliberate indifference analysis, Plaintiff asserts that had the Defendants "adequately and properly addressed his condition when they were first 'put on notice' anytime between 2010 and 2013," his osteoarthritis would not have "painfully morphed into rheumatoid arthritis." (Pl.'s Objs. PgID 1498.) Plaintiff states that "it is more than mere inference or theory that the Plaintiff suffered a "sufficiently serious" injury resulting from failing to receive medical treatment." (*Id*.) Unfortunately, as discussed *infra*, Plaintiff has submitted no medical evidence in response to Defendants' motion for summary judgment to support this "inference or theory" that his ankle injury caused his rheumatoid arthritis.

While Defendants appear to concede the objective component for purposes of their motion for summary judgment, the Court questions whether Plaintiff satisfied the objective component on such a theory. Possibly Plaintiff's obvious mobility issues and evidence that he had to "walk on the toes of his left foot" would be sufficient to

alert even a lay person to his serious medical need – in which case this prong of the deliberate indifference test would be met, at least as to his claims regarding the misdiagnosis and treatment of his foot/ankle and knee issues. However, as to his specific claim that delays in treatment caused his present serious medical condition, i.e. his rheumatoid arthritis, Plaintiff was required to place some medical evidence in the record regarding the effect of that delay. To establish the objective component of his "effect of delay" claim, Plaintiff was required to "place verifying medical evidence in the record," and not just his personal opinion, to create a genuine issue of material fact regarding whether the failure to diagnose (or treat) his rheumatoid arthritis sooner created a serious medical condition. Where the seriousness of a prisoner's claimed need for medical care is "obvious even to a lay person," this obviousness is alone is sufficient to satisfy the objective component of the adequate medical care test. *Blackmore*, 390 F.3d at 899. However, where the claimed serious medical need (here presumably rheumatoid arthritis) involves "non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Kentucky,* 238 F.3d 739, 742 (6th Cir. 2001). *See Santiago*, 734 F.3d at 591 (where prisoner is receiving treatment but claims that a delay in providing a different *specific* treatment caused his serious

medical need, "'medical proof is necessary to assess whether the delay caused a serious medical injury'" and finding plaintiff failed to satisfy the objective component of the deliberate indifference inquiry ) (citing *Napier*, 238 F.3d at 742); *Blosser v. Gilbert*, 422 F. App'x 453, 460-61 (6th Cir. 2011) (where plaintiff "was regularly examined by the medical staff at the prison and received his pain medication, monitoring, and care" but complained that "he just was not sent to the specialist right away," he was required to "provide verifying medical evidence of the detrimental effect of the delay to succeed" in establishing the objective component) (citing *Blackmore*, 390 F.3d at 898 and *Napier*, 238 F.3d at 742). Plaintiff has placed no such evidence in the record here that would establish that any delay in diagnosing or treating Plaintiff's rheumatoid arthritis or in sending him to a rheumatologist sooner caused his rheumatoid arthritis. Nor is there any evidence in the extensive medical records submitted by both parties from which such a conclusion could be reasonably inferred. In fact the only evidence in the record which speaks to the delay suggests that it had no effect on Plaintiff's development of the disease. (Brady Decl. ¶¶ 8-10.) Accordingly, as related to Plaintiff's claim that he developed rheumatoid arthritis due to Defendants' delay in diagnosing and treating that condition, because Plaintiff failed to place independent verifying evidence in the record regarding the effect of any delay, such a claim would "fail[] under the effect-of-delay standard." *Blosser*, 422 F.

App'x at 421. However, because the Court finds that Plaintiff fails to create a genuine issue of material fact as to the subjective standard, it need not rely on this failure to establish the objective prong of the deliberate indifference analysis.

**The subjective component**. Plaintiff also asserts that the Corizon Defendants (although his Objections are to the Report and Recommendation dealing only with the Corizon Defendants, Plaintiff often refers to the MDOC and the Corizon Defendants collectively) were "subjectively aware" of the "serious and substantial risk of plaintiff developing" rheumatoid arthritis and "deliberately ignore[d] his many kites and grievances" and failed to provide him "adequate and proper care." (Pl.'s Objs. PgID 1499.) As to the subjective element, the Court analyzes the conduct of each Defendant separately to determine whether *that* Defendant's conduct evidences "deliberateness tantamount to an intent to punish." *Titlow v. Correctional Medical Services, Inc.*, 507 F. App'x 579, 584 (6th Cir. 2012). Plaintiff must show "that each defendant [], through his or her own individual actions, *personally* violated plaintiff's rights under clearly established law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (emphasis in original) (citations omitted). "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).

Much of Plaintiff's Objection is a generalized disagreement with the Magistrate Judge's conclusions and Plaintiff refers to the conduct of "Defendants" generally. Only those objections that are specific are entitled to a *de novo* review under the statute. *Mira* 806 F.2d at 637. "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id*. A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. An "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection. *Howard*, 932 F.2d at 509. However, to the extent that Plaintiff has expressed specific objection to the Magistrate Judge's conclusions with respect to the conduct of an individual Defendant, these Objections are addressed below.

### (i). Dr. Brady

As Plaintiff asserts in his Objections, and as is clear from the recitation of facts above, Plaintiff had contact relevant to his claims in this action with Dr. Brady. Specifically as to Dr. Brady, Plaintiff objects to the Magistrate Judge's findings because Plaintiff alleges that Dr. Brady acknowledged that his right foot had been previously fractured and chose not to listen to Plaintiff and took away Plaintiff's detail for a wheelchair, replaced it with a cane, and told Plaintiff he needed to walk more on

his swollen leg and foot for exercise. (ECF No. 99, Pl.'s Objs. at 15, PgID 1489.) Even assuming that Dr. Brady did acknowledge that Plaintiff's foot had been previously fractured, which Dr. Brady denies and which the October 23, 2012 x-rays disprove, Plaintiff has failed to place any medical evidence in the record to rebut or discredit in any way Dr. Brady's opinion that even if Plaintiff's foot was previously fractured, there is no indication that it healed incorrectly or that it would have required a different course of treatment. (Brady Decl. ¶¶ 24-26.) *Santiago*, 734 F.3d at 593 (citing *Reilly v. Vadlamudi*, 680 F.3d 617, 625–27 (6th Cir. 2012)). "On summary judgment, [Plaintiff] may not simply point to a delay and argue that a jury might not believe the doctor's explanation; he must put forth some additional evidence of deliberate indifference, since ultimately he has the burden of proof at trial." *Santiago*, 734 F.3d at 593.[2]

_____

[2] On January 22, 2018, Magistrate Judge Stafford issued an Order Denying Plaintiff's Motion to Stay, For Appointment of Expert Witness, and For Appointment of Counsel, and Denying in Part Plaintiff's Motion to Compel, But Ordering the MDOC Defendants to Respond to Plaintiff's Motion to Compel by February 2, 2018. (ECF No. 111.) No objections to this Order have been filed by any party and the MDOC Defendants who were Ordered to respond, i.e. Arlene Rogers, Deborah Ellenwood, Mary Velarde, and Kimberly Korte, have filed their Response to Plaintiff's Motion to Compel as Ordered by the Magistrate Judge. (ECF No. 113, MDOC Defendants' Response to Plaintiff's Motion to Compel.) The Court notes that in the two years that Plaintiff's Amended Complaint was pending, Plaintiff never served discovery on the Defendants and waited until after the Magistrate Judge had issued her Report and Recommendation on Summary Judgment to do so. Plaintiff never filed a Fed. R. Civ. P. 56(d) affidavit in response to Defendants' well-supported motions for summary

Additionally, the medical records submitted by both Plaintiff and the Defendants fail to support Plaintiff's Objection that Dr. Brady took away a detail for a wheelchair.[3] The only "evidence" Plaintiff cites in support of this Objection is not evidence at all but rather an allegation in Plaintiff's Amended Complaint that alleges on a visit to Dr. Brady on October 14, 2013, Plaintiff "was told he could have a walker rather than a wheelchair." (Compl. ¶ 45.) This allegation in the Amended Complaint is likewise not supported by any record evidence that supports Plaintiff's statement that on October 28, 2013, Dr. Brady took away a wheelchair that had been ordered by Dr. Sudhir. In fact the medical record evidence shows that Plaintiff did not see Dr. Sudhir until October 24, 2013, which is the date on which Dr. Sudhir ordered a wheelchair. Dr. Brady could not have "taken away" this detail when he saw Plaintiff

---

judgment, even though the Court gave Plaintiff additional time in each instance to respond to those motions, which Plaintiff did with argument and evidence of his own from his prison and medical records. The Magistrate Judge correctly denied Plaintiff's request for a stay and appointment of an expert and for discovery which, first filed only *after* the Magistrate Judge issued her Report and Recommendation, was simply too late. *See Lane v. Wexford Health Sources*, 510 F. App'x 385, 388 (6th Cir. 2013) (rejecting prisoner plaintiff's argument that the summary judgment record was incomplete where plaintiff failed to file a Rule 56(d) affidavit in response to defendant's motion for summary judgment).

[3] Both Plaintiff and Defendants rely on the same medical and prison records, whose contents are considered undisputed for purposes of analyzing Defendants' motions. *See Cobbs v. Pramstaller*, 475 F. App'x 575, 581 (6th Cir. 2012) (relying on the "undisputed evidence in the record" to determine that kites did not reach the record).

on October 14, 2013.

This Objection is OVERRULED and the Court finds that the Magistrate Judge correctly concluded that Plaintiff has failed to submit evidence on which a reasonable jury could conclude that Dr. Brady was deliberately indifferent to Plaintiff's medical needs. This record establishes that Dr. Brady provided extensive care and treatment to this Plaintiff – although it was not the care that Plaintiff believed he deserved. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

### (ii). Dr. Alford

Plaintiff's Objection as to Dr. Alford states that during his time at Duane Waters, which was during and after his knee replacement surgery, he complained to Dr. Alford about his foot injury and she ordered x-rays and prescribed pain medication. (Pl.'s Objs. at 13, PgID 1487.) The fact that Dr. Alford responded to Plaintiff's complaints by ordering x-rays and prescribing pain medication does not suggest deliberate indifference. "Where a prisoner has received some medical

attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

This Objection is OVERRULED. The Magistrate Judge correctly concluded that Dr. Alford was minimally involved in Plaintiff's treatment, and Plaintiff may have disagreed with that treatment, but this does not rise to the level of deliberate indifference.

### (iii). Dr. Martin

Plaintiff Objects that Dr. Martin brought Plaintiff in for an annual check up and examined his foot, and was aware of his pain, but failed to order any test, x-ray or other procedure that would have alleviated his pain. Plaintiff saw Dr. Martin only once, on May 28, 2014. (Compl. ¶ 52; Med. R. PgID 1233-34; Brady Decl. ¶ 39.) Dr. Martin examined Plaintiff's right foot and noted that the pain extended from the right great toe laterally to the right posterior ankle. (Med. R. PgID 1233.) Dr. Martin noted that Plaintiff had previously been prescribed and was currently taking an NSAID, Mobic, and did not order further assessment or treatment of Plaintiff's right foot. (*Id.*) "Where a prisoner has received some medical attention and the dispute is

over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

This Objection is OVERRULED. The Magistrate Judge correctly concluded that Dr. Martin was minimally involved in Plaintiff's treatment, and Plaintiff may have disagreed with that treatment, but this does not rise to the level of deliberate indifference.

**(iv). Dr. Prasad**

Plaintiff Objects to the Magistrate Judge's conclusion regarding Dr. Prasad. Plaintiff objects stating that Dr. Prasad saw Plaintiff on June 7, 2013, and "chose to take a passive approach" to Plaintiff's problem and did not make proper recommendations with regards to Plaintiff's condition. In fact, when Plaintiff saw Dr. Prasad on June 7, 2013, Dr. Prasad advised to take Naprosyn (an NSAID) and added Tylenol and gave an ace wrap to use as directed and to kite if symptoms got worse and provided a detail for a cane. (Compl. ¶ 38; Med. R. PgID 933-34; Jindal Decl. ¶ 24; Med. R. PgID 935.) In addition, Dr. Prasad had seen Plaintiff on April 24, 2012. On that visit, Dr. Prasad examined Plaintiff's left knee which was tender and increased

Plaintiff's Naprosyn dosage, prescribed Tylenol and an ace wrap and ice and one week of rest. (Med. R. PgID 886; Jindal Decl. ¶ 16.) Dr. Prasad also ordered Plaintiff a left knee brace. (Med. R. PgID 888; Jindal Decl. ¶ 16.) "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

This Objection is OVERRULED. The Magistrate Judge correctly concluded that while Plaintiff may have disagreed with Dr. Prasad's treatment, this does not rise to the level of deliberate indifference.

### (v). Dr. Sudhir

Plaintiff Objects to Dr. Sudhir's medical opinion that cortisone injections would not help Plaintiff's knee and that Plaintiff needed surgery. On October 24, 2013, Plaintiff saw Dr. Sudhir who noted severe Osteoarthritic changes in Plaintiff's left knee, with deformity and limited range of motion. Dr. Sudhir ordered a wheelchair for Plaintiff for long distances, a geriatric pusher and an elevator pass. Dr. Sudhir ordered Plaintiff to continue with the Mobic and planned to send in an orthopedic consult. Dr. Sudhir did *not* note the presence of an unhealed fracture in Plaintiff's

foot and did not order steroid injections. (Med. R. PgID 972-975; Brady Decl. ¶ 29.) In fact Dr. Sudhir did refer Plaintiff for an Orthopedic consult and Plaintiff did indeed have knee replacement surgery.

"Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

This Objection is OVERRULED. The Magistrate Judge correctly concluded that while Plaintiff may have disagreed with Dr. Prasad's treatment, this does not rise to the level of deliberate indifference.

### (vi). PA Jindal

Plaintiff's only reference to PA Jindal in his Objections relates to whether the claims against her are barred by the statute of limitations and whether his grievances were timely. The remainder of his Objections to the Magistrate Judge's deliberate indifference ruling refer generically to non-specific conduct of "the Defendants" and Plaintiff claims that he is the victim of a "continuing violation." (Pl.'s Objs. 22-26.) Plaintiff did not raise this "continuing violation" argument in his response to the

Corizon Defendants' motion for summary judgment and cannot raise it for the first time in his Objections. Therefore, the Court need not address the "continuing violation" argument. In any event, the continuing violation theory "allows the court to consider as timely all relevant violations including those that would otherwise be time [-]barred . . . ." *Bruce v. Correctional Medical Services, Inc.*, 389 F. App'x 462, 466 (6th Cir. 2010). "Actual actions by [medical providers] of refusing medical care represent discrete unlawful acts (beyond passive inaction) that trigger the statute of limitations." *Id.* at 466 (internal quotation marks and citations omitted) (first alteration added). "Passive inaction does not support a continuing violation theory." *Id.* The Sixth Circuit "employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions." *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003). *See, e.g. Flottman v. Hickman County, Tenn.*, No. 3–09–0770, 2010 WL 4054150 (M.D. Tenn. Oct.14, 2010) (holding that the continuing-violation doctrine did not apply to plaintiff's § 1983 Eighth Amendment claim). Thus, this theory does not fit Plaintiff's claims against PA Jindal and any claims against her based on events that occurred prior to July 25, 2011 are barred. But even if the Court were to consider those acts of PA Jindal about which Plaintiff complains that occurred prior to July 25, 2011, Plaintiff still has not demonstrated that

PA Jindal was deliberately indifferent to his medical needs.[4]

Liberally construing this Objection No. 2 as continuing to complain of PA Jindal's medical care for the Plaintiff (despite the fact that Plaintiff does not refer specifically to PA Jindal and speaks generally of "Defendants"), Plaintiff complains that he was "forced to walk on a broken foot and swollen tendons in his legs and joints" and that Defendants should have "aggressively began aggressive treatment of his condition at least beginning in 2011." (Pl.'s Objs. 25, PgID 1499.) First, there is no evidence in Plaintiff's medical record of a "broken foot." As set forth in great detail above, PA Jindal treated Plaintiff continuously for what she initially suspected was an ankle sprain and an x-ray obtained on October 23, 2012 confirmed that there was no fracture visible, only mild arthritic changes and a spur. (Med. R. PgID 904.) An x-ray taken a year later showed the same arthritic changes and spur in addition to "old healed trauma." (ECF No. 13, PgID 125.) Dr. Brady has opined in his Declaration that "old healed trauma" does not necessarily indicate a former fracture

_____

[4] In this section of his Objections, Plaintiff cites law that applies to the exhaustion of grievances, not to the tolling of the statute of limitations. *See, e.g. Ellis v. Vadlamudi*, 568 F. Supp. 2d 778, 784 (E.D. Mich. 2008) (holding that "a grievance that identifies the persistent failure to address [a chronic, ongoing] condition must be considered timely as long as the prison officials retain the power to do something about it"). *McAdory v. Engelsgjerd*, No. 07-cv-13192, at *4 (E.D. Mich. Feb. 11, 2010) ("[i]n cases involving a failure to treat [] a chronic condition, the courts have held that prison officials may not parse the timeliness" of a grievance for each individual treatment decision).

and that, in any event, there is no indication that whatever trauma may have been suffered healed improperly. Plaintiff relies on these same medical records and has submitted no rebutting medical evidence, either by way of affidavit or otherwise, to support his claim that he should have received different or more "aggressive" treatment, and most certainly does not offer any evidence of what that more aggressive treatment might have been. Dr. Brady opines in some detail as to why the care provided by PA Jindal to the Plaintiff, which consisted of multiple visits, prescription of anti-inflammatories (NSAIDs) and pain medication, ace wraps, assistive devices, and diagnostic tests, met or exceeded the standard of care. There is simply no evidence on which a reasonable juror could conclude that PA Jindal's treatment of the Plaintiff was deliberately indifferent to his claims of pain and discomfort related to his ankle/foot or that her failure to conclude that Plaintiff's ankle/foot injury had caused him to develop rheumatoid arthritis demonstrated deliberate indifference. Importantly, during the period of time about which Plaintiff complains, Plaintiff was seen by multiple doctors, including an orthopedic surgeon who operated on Plaintiff, and none of them suggested that Plaintiff might be suffering from rheumatoid arthritis and none suggested in their notes that Plaintiff had a "broken foot." Plaintiff has theories about what caused his rheumatoid arthritis, but no evidence to support them. And to the extent that Plaintiff disagrees with PA Jindal's diagnosis and treatment,

this is simply not actionable under § 1983. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875.

This Objection is OVERRULED. The Magistrate Judge correctly concluded that while Plaintiff may have disagreed with PA Jindal's treatment, on this record no reasonable juror could conclude that PA Jindal was deliberately indifferent to Plaintiff's medical needs.

### 3. Plaintiff's Objection No. 3: Plaintiff Objects to the Magistrate Judge's dismissal of his state law claims against Corizon.

"[W]hen, as here, "all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996); *Runkle v. Fleming*, 435 F. App'x 483, 486 (6th Cir. 2011) (dismissal of pendent state law claims following dismissal of plaintiff's § 1983 deliberate indifference claims was not an abuse of discretion where state law claims presented complex negligence issues). Here, the Magistrate Judge correctly concluded that Plaintiff's state law claims of intentional infliction of emotional distress, battery and gross negligence against these Defendants, which sound in medical malpractice, present issues of state law. Because the Court concludes that the Magistrate Judge correctly dismissed each of Plaintiff's

federal claims against each of the Corizon Defendants, and because Plaintiff's remaining state law claims involve complicated issues of state medical malpractice law, the Magistrate Judge's ruling dismissing Plaintiff's state law claims under 28 U.S.C. § 1367 without prejudice was appropriate here. Plaintiff's Objection is OVERRULED.

### 4. The Magistrate Judge correctly dismissed Corizon.

Although Plaintiff does not direct a specific Objection to the Magistrate Judge's ruling dismissing Corizon, Plaintiff does address this ruling in the context of his deliberate indifference Objection. (Pl.'s Obj. at 19, PgID 1493.) Because the Magistrate Judge correctly dismissed Plaintiff's federal claims against the individual Corizon Defendants, it was appropriate to dismiss the § 1983 claims against Corizon, which is deemed to act in a governmental capacity when acting as a contractor providing medical care to prisoners. *Baker v. Stevenson*, 605 F. App'x 514, 520 (6th Cir. 2015) ("As a private entity contracted to perform the traditional state function of prison medical care, Corizon may be sued for constitutional violations.") (citing *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)). "Corizon cannot be held liable on a theory of respondeat superior, but it can be held liable on the basis of a corporate policy, practice, or custom that causes the plaintiff's injury." *Id.* Plaintiff's Amended Complaint does not identify any Corizon policies, practices, or customs.

In any event, the Magistrate Judge correctly ruled that "[b]ecause none of the individual [Corizon] defendants violated [Plaintiff's] Eighth Amendment rights, the 'policy, practice, and custom' claim against Corizon must also fail." *Baker*, 605 F. App'x at 520 (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)). This Objection is OVERRULED. The Magistrate Judge correctly concluded that Plaintiff's claim against Corizon should be dismissed.

## B. Defendants' Objection to the Magistrate Judge's January 18, 2017 Report and Recommendation.

Defendants do not disagree with the Magistrate Judge's final recommendation to decline to exercise supplemental jurisdiction over Plaintiff's state law claims and to dismiss those claims without prejudice. (ECF No. 95, Defs.' Objs. 3, PgID 1457.) This Court agrees with that recommendation given that the federal claims against the Corizon Defendants have been dismissed and additionally finds that there are "compelling reason[s] for declining jurisdiction i[n] that [u]nder Michigan statutory law, the requirements for a viable medical malpractice claim are substantial and involve, among other things, considerations of statutes of limitations, notices of intent, and affidavits of merit accompanying the complaint." *Hall v. Holmes*, No. 12-10316, 2012 WL 3842475, at *6 (E.D. Mich. Aug. 17, 2012) (internal quotation marks and citations omitted) (first alteration added), *adopted at* 2012 WL 3842571, (E.D. Mich.

Sep. 5, 2012). However, in order to preserve the issue for appeal, the Defendants object to the Magistrate Judge's conclusion that the affidavit of merit required under Michigan law in a medical malpractice case is procedural, not substantive, and therefore not required in a federal court action asserting a medical malpractice claim under Michigan law. (*Id*.)

This Court acknowledges that "[t]he federal district courts in Michigan appear to be split on whether Michigan's medical malpractice statutory requirements [which include the filing of an affidavit of merit] are substantive or procedural in nature." *Hall*, 2012 WL 3842475 at *6 (alteration added) (comparing *Long v. Saginaw Valley Neurosurgery*, 411 F. Supp. 2d 701, 702 (E.D. Mich. 2006) (affidavit of merit procedural and not applicable in federal court) *with Jones v. Correctional Medical Services, Inc.*, 845 F. Supp. 2d 824, (W.D. Mich. 2012) (applying affidavit of merit requirement in federal court)). This Court agrees with then Magistrate Judge now District Judge Michelson's determination in *Hall* that "[r]ather than having another federal court address this issue, the Court believes that judicial efficiency would be better served by declining jurisdiction and allowing Plaintiff to file his state malpractice claims in state court." This Court likewise declines to weigh in on whether the affidavit of merit rule is procedural or substantive and simply declines to exercise jurisdiction over, and therefore declines to address, the merits of Plaintiff's

state law claims, including those which sound in medical malpractice.

To the extent that the Magistrate Judge did address the merits of Plaintiff's state law claims and would have declined to dismiss them based upon the reasoning of *Long*, the Court REJECTS that aspect of the Report and Recommendation. The Court finds that the Magistrate Judge correctly declined to assert supplemental jurisdiction over Plaintiff's state law claims, OVERRULES the Defendants' Objections as MOOT, declines to address the merits of the state law claims at all and dismisses them under 28 U.S.C. § 1367(c) WITHOUT PREJUDICE.

**C.** **Plaintiff's Objections to the Magistrate Judge's August 15, 2017 Amended Report and Recommendation to Grant Defendants VanAusdale, Kopka, Rothhaar, and Klee's Motion to Dismiss and/or for Summary Judgment.**

As an initial matter, the Court denies Plaintiff's requests for extensions of time to file additional objections to the Magistrate Judge's Amended Report and Recommendation. On August 15, 2016, Magistrate Judge Stafford issued her original Report and Recommendation to Grant Defendants' VanAusdale, Kopka, Rothhaar, and Klee's Motion for Summary Judgment. (ECF No. 89, Report and Recommendation.) On September 29, 2016, having received an extension of time from the Court to do so, Plaintiff filed lengthy substantive Objections to the August 15, 2016 Report and Recommendation. (ECF No. 92, Objections.) On July 20, 2017,

this Court issued an Order vacating the Magistrate Judge's August 15, 2016 Report and Recommendation in light of inconsistencies with a prior Report and Recommendation issued on June 2, 2015 (ECF No. 46) and adopted by this Court on March 28, 2016 (ECF No. 77), in which the Magistrate Judge denied the motion to dismiss of certain other MDOC Defendants, finding that Plaintiff had properly exhausted his  claims against them.  The Magistrate Judge has now issued her Amended Report and Recommendation to Grant Defendants VanAusdale, Kopka, Rothhaarr and Klee's Motion to Dismiss and/or For Summary Judgment (ECF No. 106) that is presently before the Court.

The Court finds that the Plaintiff's substantive Objections to the Original vacated Report and Recommendation sufficiently address each of the conclusions reached by the Magistrate Judge in her Amended Report and Recommendation that are adverse to the Plaintiff. In other words, Plaintiff has prevailed on his exhaustion arguments, the only aspect of the Magistrate Judge's recommendation that changed, and he filed wide-ranging substantive objections to the remainder of the Magistrate Judge's original Report and Recommendation, which the Court now addresses in the context of the Amended Report and Recommendation. The Court further finds that allowing additional late-filed Objections from the Plaintiff would be both duplicative and unfair, as it would give Plaintiff the opportunity to revisit and revise his original

Objections, which already broadly address the conclusions reached by the Magistrate Judge in her Amended Report and Recommendation. Accordingly, the Court DENIES Plaintiff's requests for extensions of time to respond to the Amended Report and Recommendation. (ECF Nos. 107, 109.)

1. **"Objection No. 1: Plaintiff Objects to those parts of the Magistrate Judge's Report and Recommendation granting Defendants summary judgment motion concluding that he failed to exhaust all of his administrative remedies against Van Ausdale, Kopka, Rothhaar, and Klee."**[5]

In her Amended Report and Recommendation, the Magistrate Judge revised her ruling on the issue of exhaustion and correctly concluded that grievance ARF-13-09-2586-12D1 ("2586-12D1") was resolved on the merits by the MDOC, and was not rejected for any procedural error. Indeed, the MDOC expressly stated that its denial of Plaintiff's Step III grievance represented an exhaustion of administrative remedies. (ECF No. 40-3, PgID 320.) The Magistrate Judge, in her Amended Report and Recommendation, concluded that this grievance did, therefore, exhaust claims against Defendants Van Ausdale and Klee but still did not exhaust the claims against MDOC

---

[5] Objection Nos. 4 and 5 also challenge the Magistrate Judge's ruling on the issue of exhaustion as to these Defendants. Because the Magistrate Judge's Amended Report reversed her previous ruling on the issue of exhaustion, and found that Plaintiff had exhausted claims against Van Ausdale, Klee, and Kopka, and because this Court has found that Plaintiff likewise exhausted claims against Rothhaar, these Objections are also OVERRULED. Plaintiff's claims against these Defendants are dismissed on other grounds, not for failure to properly exhaust.

Defendants Rothhaar and Kopka because the allegations in the Amended Complaint regarding these Defendants involved conduct "several months removed" from the allegations of grievance 2586-12D1.  (Amended Report at 15, PgID 1797.)

This Court disagrees with that conclusion.  In paragraph 42 of the Amended Complaint, Plaintiff alleges that he kited healthcare on August 23, 2013, requesting to see the doctor regarding canceled appointments for steroid injections.  (Compl. ¶ 42.)  Likewise, grievance 2586-12D1 expressly references the August 23, 2013 kite to healthcare and goes on to expressly name "P.A." (Jindal), "H.U.M." (Kopka) and "Hd. Nurse" (Rothhaar) as having denied him treatment in connection with the conduct complained of in that grievance and further states that "the H.U.M. and "Head Nurse Tammy" both signed grievances "stating that this was the recommendation to treat my ailment."  (Compl. PgID 226.)  In referring to the August 23, 2013 kite, the Amended Complaint does, when read liberally, allege claims against Defendants Kopka and Rothhaar specifically related to grievance 2586-12D1.    Accordingly, the Court GRANTS Plaintiff's Objection on this limited point and  REJECTS that portion of the Magistrate Judge's Amended Report holding that grievance 2586-12D1 did not exhaust claims against Defendants Kopka and Rothhaar.

2. **"Objection No. 2: Plaintiff objects to that part of the Magistrate Judge's Report and Recommendation granting Defendants summary judgment motion because his allegations did not rise to the level of deliberate indifference."**

As discussed at length *supra*, the test for determining whether an officer was deliberately indifferent has both a subjective and an objective component. *Comstock*, 273 F.3d at 702. The objective component is satisfied if the plaintiff alleges that the medical need at issue is "sufficiently serious." *Id.* at 703 (quoting *Farmer*, 511 U.S. at 834). Defendants have expressly conceded, for purposes of their motion for summary judgment against these four MDOC Defendants, that Plaintiff suffered from a serious condition as a result of the injuries to his foot. (ECF No. 71, Defs.' Mot. at 28, PgID 559.)

To satisfy the subjective criterion, the plaintiff must demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). "The requirement that the [doctor or]

official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* at 703 (citing *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970). *See also Karnes*, 398 F.3d at 875 ("a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment" so that "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.")

Deliberate indifference to medical needs may be established by showing an interruption of a prescribed plan of treatment, or a delay in medical treatment. *Estelle*, 429 U.S. at 104-05; *Darrah*, 865 F.3d at 368-69). However, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860, n. 5. *See also Sanderfer*, 62 F.3d at 154 ("Deliberate indifference, however, does not include negligence in diagnosing a medical condition"). However, treatment decisions that are "so woefully inadequate as to amount to no treatment at all" can be

actionable under the Eighth Amendment. *Westlake*, 537 F.2d at 860 n. 5. *See also Calhoun*, 408 F.3d at 820 ("'When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'").

As discussed *supra*, as to the subjective element, the Court analyzes the conduct of each Defendant separately to determine whether *that* Defendant's evidences "deliberateness tantamount to an intent to punish." *Titlow*, 507 F. App'x at 584. Plaintiff must show "that each [Defendant] officer, through his or her own actions, personally violated [P]laintiff's rights under clearly established law." *Moseley*, 790 F.3d at 653 (emphasis in original) (citations omitted). Throughout his Objections, Plaintiff asserts that he complains of an "ongoing" violation of his constitutional rights by "all healthcare staff," and repeatedly cites to law that applies to the exhaustion of grievances. *See, e.g. Ellis v. Vadlamudi*, 568 F. Supp. 2d 778, 784 (E.D. Mich. 2008) (holding that "a grievance that identifies the persistent failure to address [a chronic, ongoing] condition must be considered timely as long as the prison officials retain the power to do something about it"). The "ongoing condition" theory that some courts have applied in the context of exhaustion, even assuming it would apply to the exhaustion analysis this case, does not relieve the Plaintiff of the burden to demonstrate the deliberately indifferent *mens rea* of *each* Defendant separately

when attempting to establish the subjective component of his Eighth Amendment claim.[6] *See, e.g. Mattox v. Edelman*, 851 F.3d 583, 596 n. 7 (6th Cir. 2017) (noting that its holding that plaintiff had exhausted certain claims against certain defendants did not in any way suggest a view on the merits of plaintiff's claims and "should not be misconstrued as precluding the district court from considering any other properly filed dispositive motions on remand").

In his Objection to the Magistrate Judge's deliberate indifference ruling, Plaintiff does not mention the individual actions of any of these Defendants, apart from the introductory remark that "MDOC Defendants Van Ausdale, Lori Kopka, and Tammy Rothhaar, although not specifically named" were involved in his care and treatment. (ECF No. 92, Pl.'s Objs. PgID 1374.) This type of general objection is routinely disregarded altogether. However, given Plaintiff's *pro se* status, the Court reviews the Objections in the larger context of Plaintiff's Amended Complaint and his

---

[6] Even in the context of exhaustion, this type of generalized complaint has limits. "If generalized dissatisfaction with an inmate's medical care were sufficient to exhaust all possible claims related to that care, then prisoners could bring claims in federal court without ever giving prison staff a fair chance to remedy a prisoner's complaints. When an inmate is receiving little or no medical care at all, it might arguably be appropriate to generally allege inadequate medical care. However, where, as here, an inmate is receiving care, we hold that the inmate can only exhaust claims where he notifies the relevant prison medical staff as to which facets of his care are deficient." *Mattox v. Edelman*, 851 F.3d 583, 596 (6th Cir. 2017). Here, the summary judgment record establishes that Plaintiff was receiving continuous care; just not the care he felt he should have had.

grievances and kites that he offers in support of the allegations of his Amended Complaint.

### a. Defendant Kopka.

Plaintiff alleges in paragraphs 32-33 of his Amended Complaint that in response to Plaintiff's November 13, 2012 medical kite stating that he was being denied urgent medical care, H.U.M. Kopka just told him to "continue to kite." (Compl. ¶¶ 32-33.) However, the exhibits that Plaintiff attaches to his Amended Complaint in support of this allegation demonstrate that Nurse Kopka in fact responded that Plaintiff had recently been seen several times by the medical provider regarding the treatment of his foot injury, the most recent being on November 13, 2012, just two days before the kite that Kopka was addressing, during which the medical provider discussed with Plaintiff the results of x-rays taken on October 23, 2012 of his left knee and right foot. (ECF No. 13, Compl. PgID 162; Med. R. PgID 904-910.) Nurse Kopka therefore instructed Plaintiff to continue to kite if his symptoms did not improve following his recent visit to the medical provider. (*Id.*) Plaintiff did not kite again, according to the records he attached to his Amended Complaint, until April 7, 2013. (Compl. PgID 121.) The Magistrate Judge correctly concluded that no reasonable juror could conclude that Nurse Kopka was deliberately indifferent in this instance to Plaintiff's medical needs, that she "actually perceived

a risk of harm and consciously chose to ignore that risk," when she noted that Plaintiff had been seen by a medical provider two days earlier to discuss the results of x-rays of his left knee and right foot and instructed him to continue to kite if his symptoms did not improve in the wake of that appointment.

In paragraph 42 of his Amended Complaint, Plaintiff complains that on August 23, 2013, he kited healthcare requesting to see a doctor because he had not received steroid injections that had been ordered by the doctor. (Compl. ¶ 42.) As discussed *supra*, this paragraph relates to conduct complained of in grievance 2586-12D1 regarding canceled appointments for steroid injections that had been ordered by PA Jindal on July 11, 2013 and were scheduled to begin on July 24, 2013. (Med. R. PgID 947.) With respect to H.U.M. Kopka, this grievance alleges that he was "denied treatment by the H.U.M." and that "this treatment was named in a *previous grievance*, where H.U.M. and Head Nurse Tammy both signed stating that this was the recommendation to treat my ailment." (Compl. PgID 226, 9/4/13 Grieivance) (emphasis added). Plaintiff then complains that each time his appointment is scheduled, it gets canceled. Plaintiff does not allege that H.U.M. Kopka was responsible for these cancellations or that Kopka failed to respond to his complaints about the canceled injections. In fact, the medical records disclose that Nurses Paratchek and Velarde responded regarding the canceled appointments for the steroid

injections ordered by PA Jindal, explaining that they had to be canceled due to staff shortages and other "emergent issues," but would be rescheduled. (Compl. PgID 173-175.) In fact Plaintiff was seen by Dr. Brady on September 30, 2013, and Dr. Brady countermanded PA Jindal's order for steroid injections and ordered that injections would be "considered" at a later time based upon the results of a new set of x-rays ordered by Dr. Brady that day. (Med. R. PgID 959.)[7]

It is not clear what Plaintiff refers to in grievance 2586-12D1 when citing a "previous grievance" that was "signed" by both Nurse Rothhaar and H.U.M. Kopka, or how that amounted to a denial of treatment, but the Step I Grievance Responses attached to Plaintiff's Amended Complaint on grievances 2013 04 1390 12D3 ("1390-12D3") and 2013 06 1743 12D3 ("1743-12D3") were signed by both Rothhaar and Kopka, although both of these grievances were investigated, responded to, and reviewed *before* PA Jindal ordered the steroid injections. Regardless of the timing

_____

[7] The issue of the Plaintiff's missed steroid injections does merit mention. It is well established that "'interruption of a prescribed plan of treatment could constitute a constitutional violation.'" *Darrah*, 865 F.3d at 368 (quoting *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991)). Here, the record evidence establishes that the injections that PA Jindal ordered for Plaintiff were rescheduled due to staff shortages and emergent medical issues. And ultimately Dr. Brady reversed PA Jindal's recommendation for the steroid injections and Plaintiff never did receive them, but was scheduled for a total knee replacement instead, which he received. Plaintiff has introduced no evidence to contradict these facts that are supported by Plaintiff's medical records. These facts do not support a claim of constitutionally offensive deliberate indifference.

discrepancy, it is well established that participation in the grievance process generally cannot support a finding of active unconstitutional conduct. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). In any event, in response to grievance 1390-12D3, signed by respondent Rothhaar on May 31, 2013 and reviewed by Kopka on June 5, 2013, Nurse Rothhaar copiously details Plaintiff's medical history regarding his complaints of pain in his knee, foot, and other joints, further notes that she has discussed her investigation results with both PA Jindal and the "HUM," and scheduled Plaintiff to see a medical doctor for evaluation. (Compl. PgID 203.) The medical records reveal that Plaintiff was seen two days later, on June 7, 2013, by Dr. Anil Prasad, who advised that Plaintiff take the NSAID Naprosyn and Tylenol, use an ace wrap and a cane, and kite if symptoms if got worse. (Jindal Decl. ¶ 24; Med. R. PgID 935.) No reasonable juror could conclude that Kopka's conduct in approving the process of seeking permission from PA Jindal to allow Plaintiff to be scheduled to see a medical doctor was deliberate indifference. In response to grievance 1743-12D3, responded to on June 24, 2013 by Rothhaar and reviewed by Kopka on June 28, 2013, Nurse Rothhaar refers to her response to related grievance 1390-12D3 and states that Plaintiff saw the medical doctor on June 7, 2013, but still has had no resolution to his problem. (Compl. PgID 220.) Plaintiff was seen by PA Jindal on July 11, 2013, and the steroid injections were ordered. As this discussion demonstrates, quite the

opposite of having his complaints of pain and frustration ignored, Plaintiff was receiving responses and was being seen by both medical doctors and PA Jindal continuously throughout the June and July, 2013.

No reasonable juror could conclude that any of Nurse Kopka's conduct about which Plaintiff complains rises to the level of an Eighth Amendment violation. "Obduracy or wantoness, not inadvertence or good faith error, characterizes deliberate indifference." *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992). Nurse Kopka's conduct about which Plaintiff complains here does not rise to this level of wanton indifference.

### b.   Nurse Rothhaar.

 Plaintiff specifically mentions Nurse Rothhaar in paragraph 47 of the Amended Complaint, stating that he kited her on November 22, 2013, regarding a visit with the PA that had not been scheduled and medications that had run out. (Compl. ¶ 47.) Nurse Rothhaar responded to that November 22, 2013 kite on December 3, 2013, and informed Plaintiff that his new medication (that had been ordered by PA Jindal just a few days earlier) had been approved and he should be receiving it soon. She also informed Plaintiff that the "MP" (presumably PA Jindal) had submitted a request for

a knee replacement for Plaintiff and was awaiting a response. (Med. R. PgID 1001.)[8] In fact, as discussed *supra*, on November 13, 2013, Plaintiff had seen orthopedic surgeon Dr. Ikram who diagnosed Plaintiff with severe degenerative joint disease based on updated x-rays of his knee. Dr. Ikram opined that Plaintiff was a candidate for knee replacement and the process for arranging that surgery was set in motion. Plaintiff was approved for surgery on December 9, 2013. (Med. R. 982-984, 989-1002, 1008-09; Brady Decl. ¶¶ 30-31.) Nurse Rothhaar's response to Plaintiff's November 22, 2013 kite, explaining to Plaintiff that he had just seen the orthopedic surgeon and that arrangements for approval of his total knee replacement were underway, and that his medications had been ordered, does not suggest indifference of any magnitude to Plaintiff's pain and suffering. In fact, Plaintiff must have received the "new medication" – Indocin – shortly thereafter because on December 3, 2013, Plaintiff complained that the Indocin made him nauseous and he self-discontinued it. (Med. R. PgID 1004-10.)

As discussed *supra*, the only other allegation in Plaintiff's Amended Complaint that, when generously read, appears to implicate Nurse Rothhaar is paragraph 42,

---

[8]  It appears that Nurse Paratchek also responded to a November 22, 2013 kite by Plaintiff asking when he would see the PA regarding the recommended surgery and receipt of his new medication. Nurse Paratchek responded on November 23, 2013. (Med. R. PgID 1000.)

which involves Plaintiff's kite regarding his missed steroid injections. As with H.U.M. Kopka, there is no allegation that Nurse Rothhaar was responsible for these cancellations or that Rothhaar failed to respond to his complaints about the canceled injections. As discussed *supra*, the subject of Plaintiff's kite regarding the missed steroid injections also formed the basis for grievance 2586-12D1, which alleges that Nurse Rothhaar denied Plaintiff treatment and refers to a "previous grievance" that was signed by both Kopka and Rothhaar. As explained above, the mere participation in grievance review is generally insufficient to establish liability. *Shehee*, 199 F.3d at 300. In any event, as discussed *supra*, Nurse Rothhaar's responses to grievances 1390-12D3 and 1743-12D3, in which Nurse Rothhaar copiously details Plaintiff's medical history regarding his complaints of pain in his knee, foot, and other joints, further notes that she has discussed her investigation results with both PA Jindal and the "HUM," and schedules Plaintiff to see a medical doctor for evaluation (Compl. PgID 203) and later notes Plaintiff's frustration with "no resolution to his problems," following which Plaintiff was seen by PA Jindal, demonstrate that Plaintiff was being seen and that his complaints were being addressed by both medical doctors and PA Jindal.

No reasonable juror could conclude that any of Nurse Rothhaar's conduct about which Plaintiff complains rises to the level of an Eighth Amendment violation.

"Obduracy or wantoness, not inadvertence or good faith error, characterizes deliberate indifference." *Gibson*, 963 F.2d at 853. Nurse Rothhaar's conduct about which Plaintiff complains here does not rise to this level of wanton indifference.

### c.    Warden Klee

Plaintiff alleges that Warden Klee was responsible for the administration and functions at the prison and was responsible for the treatment of Plaintiff provided by the individual Defendants "under the theory of respondent superior." (Compl. ¶¶ 68, 113.) Plaintiff also states in his Objections that the warden saw Plaintiff in the chow line and asked what was wrong and told Plaintiff he would "check into it." (Pl.'s Objs. PgID 1386.) The Magistrate Judge correctly noted that liability against Warden Klee cannot be based solely on *respondeat superior* and that any claim of a failure to supervise must allege facts demonstrating that he "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). No facts suggesting Klee's active participation in any of the acts of alleged deliberate indifference complained of in Plaintiff's Amended Complaint have even been alleged here. Plaintiff's Objection is OVERRULED.

3. **"Objection No. 3: Plaintiff Objects to that part of the Magistrate Judge's Report and Recommendation granting Defendants motion for summary judgment because the statute of limitations against Nurse Van Ausdale were filed late."**

The only allegation in Plaintiff's Amended Complaint related to Nurse Van Ausdale is that on May 11, 2011, she scheduled Plaintiff to be seen by health care on May 16, 2011, "however the appointment was never scheduled." (Compl. ¶ 23.) The Magistrate Judge correctly concluded that the claims against Van Ausdale are barred the applicable three-year statute of limitations. As discussed *supra*, Plaintiff did not raise his "continuing violation" theory in response to Defendants' motion for summary judgment and, in any event, the law he cites in his Objection relates to exhaustion of grievances, not to the running of the statute of limitations. *See supra* note 4. Plaintiff's Objection is OVERRULED.

## IV. CONCLUSION

For the foregoing reasons, the Court:

(1) ADOPTS IN PART the Magistrate Judge's January 18, 2017 Report and Recommendation (ECF No. 94), rejecting only the Magistrate Judge's ruling on the applicability of Michigan's affidavit of merit requirement, which the Court REJECTS as MOOT;

(2) OVERRULES IN PART AND SUSTAINS IN PART Plaintiff's Objections (ECF Nos. 92, 99);

(3) OVERRULES AS MOOT the Corizon Defendants' Objections (ECF No. 95);

(4) GRANTS the Corizon Defendants' Motion for Summary Judgment (ECF No. 79) and DISMISSES each of Plaintiff's federal 42 U.S.C. § 1983 claims, Counts I, II, and V, against the Defendants Corizon Health, Inc., Alford, Brady, Jindal, Martin, Prasad, and Sudhir WITH PREJUDICE;

(5) DECLINES to exercise supplemental jurisdiction over Plaintiff's state law claims of intentional infliction of emotional distress, battery and gross negligence, Counts III and IV, against the Corizon Defendants and DISMISSES those claims WITHOUT PREJUDICE;

(6) ADOPTS IN PART the Magistrate Judge's August 15, 2017 Amended Report and Recommendation (ECF No. 106), rejecting only the Magistrate Judge's ruling that Plaintiff did not properly exhaust his claims against Defendants Kopka and Rothhaar through grievance 2586-12D1, which the Court REJECTS;

(7) GRANTS Defendants Van Ausdale, Kopka, Rothhaar and Klee's Motion for Summary Judgment (ECF No. 71) and DISMISSES Plaintiff's federal 42 U.S.C. § 1983 claims, Counts I, II, and V, of Plaintiff's Amended Complaint against each of

them WITH PREJUDICE;

(8) Having dismissed all federal claims over which this Court had original jurisdiction against Van Ausdale, Kopka, Rothhaar, and Klee, the Court DECLINES, under 28 U.S.C. § 1367, to exercise supplemental jurisdiction over Plaintiff's state law claims of intentional infliction of emotional distress, battery and gross negligence, Counts III and IV, against these MDOC Defendants WITHOUT PREJUDICE; and

(9) DISMISSES Plaintiff's Amended Complaint against each of the moving Defendants and DISMISSES each of them from this action.

This Order DOES NOT close this case.[9]

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2018

_____

[9] On March 28, 2016, this Court adopted the Magistrate Judge's June 2, 2015 Report and Recommendation to deny the motion of MDOC Defendants Arlene Rogers, Deborah Ellenwood, Mary Velarde, and Kimberly Korte for summary judgment. (ECF No. 77, 6/2/15 Order.) Thus, these MDOC Defendants remain in this case. On March 26, 2018, Magistrate Judge Stafford issued an Order Regarding Plaintiff's Motion to Compel, ordering "the MDOC Defendants" to answer certain deposition questions propounded by the Plaintiff "as if they were Federal Rule of Civil Procedure 33 interrogatories." (ECF No. 114, 3/26/18 Order.) To clarify, this March 26, 2018 Order applies only to the four MDOC Defendants (Rogers, Ellenwood, Velarde, and Korte) remaining in this case after entry of this Opinion and Order.

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 27, 2018.

s/Deborah Tofil
Case Manager